0895

Catherine YAEGER, Appellant v. Norman MURPHY and Ellen Murphy, of whom Norman Murphy is Respondent.

(354 S. E. (2d) 393)

Court of Appeals

*Jack D. Cordray,* Charleston, *for appellant.*

*Samuel R. Clawson,* Charleston, *for respondent.*

Heard Jan. 27, 1987.

Decided March 16, 1987.

SANDERS, Chief Judge:

Appellant Catherine Yaeger sued her former husband, respondent Norman Murphy, and his present wife, Ellen Murphy, alleging, among other causes of action, a conspiracy between them to assault her. The trial judge directed a verdict in favor of Mr. Murphy. Mrs. Yaeger appeals. We reverse and remand.

The principal narrator of this unlikely melodrama is a woman by the name of Yvonne Beadle. Mrs. Beadle is the daughter of Mrs. Yaeger and the former stepdaughter of Mr. Murphy. At the time of the assault, she lived with Mr. and Mrs. Murphy in Charleston. Mrs. Yaeger called her as a witness.

Mrs. Beadle testified that she overheard a conversation between Mr. and Mrs. Murphy on the evening of the assault. According to her testimony, Mrs. Murphy said that she had received "a hang-up call," apparently from Mrs. Yaeger. Mrs. Beadle further testified that Mrs. Murphy said, "that lady needs to be taught a lesson," and Mr. Murphy responded, "Yeah, she needs more than that; she needs to die."

Mrs. Beadle testified that she left the room at this point because she did not feel like listening to any more of the conversation between Mr. and Mrs. Murphy, but later in the evening, Mrs. Murphy told her that Mr. Murphy had said, "if

I went over there and boxed your mother that he would pay my fine and get me out of jail."

Mrs. Beadle went on to testify that, about an hour after Mrs. Murphy told her what Mr. Murphy had said, Mr. and Mrs. Murphy went to bed, and about an hour after that, Mrs. Murphy got up and left saying she was 'going to make a jump." Mrs. Beadle testified that Mr. Murphy got up and left about an hour and a half later, after she told him what Mrs. Murphy had said.

Both Mrs. Yaeger and her son testified that Mrs. Murphy thereafter appeared at their home in Summerville and attacked Mrs. Yaeger, repeatedly striking her in the face. ("Mostly [on] my nose," she said.)

Mrs. Yaeger further testified that immediately following the attack she saw Mr. Murphy waiting nearby in a car. Her son further testified that Mr. Murphy cranked up the car as Mrs. Murphy proceeded toward it and said, "Hurry up, let's go." He also testified that he saw Mrs. Murphy drive away in the car with Mr. Murphy.

The trial judge directed a verdict in favor of Mr. Murphy on the ground that there was no evidence of any conspiracy or other wrongdoing by him. The case against Mrs. Murphy was submitted to the jury, and a verdict was returned against her in the amount of $45,000 actual damages and $5,000 punitive damages.

I

The single issue presented by Mrs. Yaeger on appeal is whether the trial judge erred in directing a verdict in favor of Mr. Murphy on the cause of action for conspiracy.

A civil conspiracy consists of three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) which causes the plaintiff special damage. *Lee v. Chesterfield General Hospital, Inc.*, 289 S. C. 6, 344 S. E. (2d) 379 (Ct. App. 1986).

In ruling on a motion by the defendant for an involuntary nonsuit, the evidence must be viewed in the light most favorable to the plaintiff, and if more than one reasonable inference can be drawn from the evidence, the case must be submitted to the jury. *Associate Management, Inc. v. E. D. Sauls Construction Co.*, 279 S. C. 219, 305 S. E. (2d) 236

(1983). The same standard must be applied in ruling on a motion for a directed verdict. *Neil v. Byrum,* 288 S. C. 472, 343 S. E. (2d) 615 (1986). "The easiest situation in which to draw the inference of [a conspiracy] is where the parties are on the scene together at the same time performing acts in support of one another." *Halberstam v. Welch,* 705 F. (2d) 472, 481 (D. C. Cir. 1983).

In the instant case, there is not only evidence that Mr. Murphy was present at the scene of the assault, but also evidence that he assisted Mrs. Murphy in her rapid departure from the scene by cranking up the getaway car for her and encouraging her to hurry in leaving. This evidence, coupled with the testimony of Mrs. Beadle that Mr. Murphy agreed Mrs. Yaeger needed "to be taught a lesson" and said she needed "to die," is sufficient in our opinion to permit an inference of his having combined with Mrs. Murphy for the purpose of injuring her. In other words, the jury could have found that, given the attitude of Mr. Murphy toward Mrs. Yaeger at the time, his presence on the scene of the assault against her was not a coincidence but rather was a part of a combination to injure her, and his acts in assisting Mrs. Murphy after the assault were not acts separate from that combination but rather were a part of it.

For these reasons, the decision of the trial judge to direct a verdict in favor of Mr. Murphy is reversed and the case is remanded for a new trial of the case against him.

## II

Mr. Murphy argues that Mrs. Beadle should not have been permitted to testify as to the statements he and Mrs. Murphy made to each other prior to the assault. This argument requires us to delve again into the almost unfathomable mysteries of the rule against hearsay, a rule of evidence more honored by its exceptions than by its application.

Among the more firmly rooted of the exceptions to the rule against hearsay is the exception which provides that a statement by a co-conspirator made during the course and in furtherance of the conspiracy may be introduced against a party. *McCormick on Evidence* § 267 at 792-93 (E. Cleary ed. 1984). *See also State v. Sullivan,* 277 S. C. 35, 42, 282 S. E. (2d) 838, 842 (1981) ("In the law of conspiracy, there is a well-

recognized exception to the rule against hearsay which permits the statements of one conspirator made during the pendency of the conspiracy, admissible against a co-conspirator, once prima facie evidence of a conspiracy is proved."); *Charles v. Texas Co.*, 199 S. C. 156, 171, 18 S. E. (2d) 719, 724 (1942) ("[T]he law seems to be settled that there being some other evidence of a conspiracy, the subsequent declaration thereof by one of the alleged conspirators is admissible against him.").[1]

Mr. Murphy contends that the exception for statements of co-conspirators is inapplicable because there was no evidence of the conspiracy independent of the statements themselves.

The statements testified to by Mrs. Beadle, which Mr. Murphy argues should not have been admitted, may be divided into two categories, one being the statements made by Mr. and Mrs. Murphy during their first conversation with each other, and the other being the statement of Mrs. Murphy as to what Mr. Murphy had told her.

## A

Mrs. Beadle testified as to three statements made during the first conversation Mr. and Mrs. Murphy had with each other (*i.e.*, Mrs. Beadle testified that Mrs. Murphy said she had received a "hang-up call," apparently from Mrs. Yaeger; Mrs. Beadle testified that Mrs. Murphy said Mrs. Yaeger needed "to be taught a lesson;" and Mrs. Beadle testified that Mr. Murphy said, "Yeah, she needs more than that; she needs to die.")

None of these statements depend for their admissibility on any exception to the rule against hearsay because none of them are hearsay. "Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted." *Abofreka v. Alston Tobacco Co.*, 288 S. C. 122, 125, 341 S. E. (2d) 622, 624 (1986).

The record reflects that the testimony of Mrs. Beadle was elicited on her direct examination by counsel for Mrs.

---

[1] Perhaps it is the existence of this exception which led Judge Learned Hand to describe the charge of criminal conspiracy as "that darling of the modern prosecutor's nursery." *Harrison v. United States*, 7 F. (2d) 259, 263 ((2d) Cir. 1925).

Yaeger. He surely did not offer these statements in evidence to prove the truth of the matters asserted (*i.e.*, that his client had made a "hang-up call;" that she needed "to be taught a lesson;" or that she needed "to die"). *See Winburn v. Minnesota Mutual Life Insurance Co.*, 261 S. C. 568, 201 S. E. (2d) 372 (1973) (the hearsay rule does not apply to an out-of-court statement offered to prove state of mind).

Thus, these statements are admissible without regard to the exception to the rule against hearsay having to do with the admissibility of statements of co-conspirators.

## B

The other statement testified to by Mrs. Beadle is the statement by Mrs. Murphy that Mr. Murphy had told her he would pay her fine and get her out of jail if she would assault Mrs. Yaeger. In view of our decision that there is other evidence of the alleged conspiracy, it is not necessary to the result which we reach for us to decide whether this statement is admissible. We nevertheless decide the question of its admissibility because this question is likely to arise when the case against Mr. Murphy is tried again on remand.[2]

Unlike the statements made by Mr. and Mrs. Murphy during their first conversation with each other, the statement of Mrs. Murphy as to what Mr. Murphy had told her appears to have been offered to prove the truth of the matter asserted (*i.e.*, that Mr. Murphy had in fact said what Mrs. Murphy said he had said). Her statement is not admissible pursuant to the exception to the rule against

---

[2] We fully recognize that our opinion from this point on is no more than dictum. As everyone knows, dictum technically does not count because it is outside of what is necessary in resolving a matter. *See* 12 WORDS AND PHRASES, "Dictum," (1954). But those who disregard dictum, either in law or in life, do so at their peril. We are reminded of the apocryphal story of a duel which was about to take place in a saloon. One of the antagonists was an unimposing little man, thin as a rail — but a professional gunfighter. The other was a big bellicose fellow who tipped the scales at 300 pounds. "This ain't fair," said the big man, backing off. "He's shooting at a larger target." The little man quickly moved to resolve the matter. Turning to the saloon keeper, he said, "Chalk out a man of my size on him. Anything of mine that hits outside the line don't count." *See* P. Trachtman, *The Gunfighters* (1974).

hearsay for statements of co-conspirators because it was not made in furtherance of the conspiracy (*i.e.*, the statement of Mrs. Murphy was merely a narrative of what Mr. Murphy had told her and did not further the conspiracy in any way). *See United States v. Haldeman,* 559 F. (2d) 31, 110 (D.C. Cir. 1976), *cert. denied,* 431 U. S. 933, 97 S. Ct. 2641, 53 L. Ed. (2d) 250 (1977) (discussing the tangled skeins of Watergate "[M]ere narratives of past events are not admissible hearsay statements."). Nor does it appear that there is any other exception to the rule against hearsay which would permit this statement of Mrs. Murphy to be admitted.[3]

Therefore, the testimony of Mrs. Beadle as to what Mrs. Murphy said Mr. Murphy had told her is inadmissible.

Reversed and remanded.

CURETON and GOOLSBY, JJ., concur.

---

[3] It might appear at first blush that the statement of Mrs. Murphy is a classic example of hearsay within hearsay or "double hearsay" (*i.e.*, the statement of Mr. Murphy to Mrs. Murphy and the statement of Mrs. Murphy to Mrs. Beadle). *See Bain v. Self Memorial Hospital,* 281 S. C. 138, 145, 314 S. E. (2d) 603, 608 (Ct. App. 1984) ("[H]earsay included within hearsay is not excluded from evidence if each part of the combined statements falls within some exception to the rule against hearsay."). However, such is not the case because it does not appear that the statement of Mr. Murphy was offered in evidence to prove the truth of the matter asserted (*i.e.*, that he would in fact pay a fine for Mrs. Murphy and get her out of jail if she would assault Mrs. Yaeger). Of course, this does not make any difference whatsoever to either the result which we reach or our dictum.